1  Law Office if Thomas J. Nolan, Inc.
   Thomas J. Nolan  State Bar No. 66992
2  500 So Lake Ave., Suite 546
   Pasadena, California, 91101
3  tnolan@nolanlaw.com
   (818) 928-1115- Office
4  (818) 928-1122- Facsimile
   (626) 818-4833- Mobile
5
6  Attorney for Victim
   Basquiat Venice Investment Group
7

8                  UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11                                        | **Case No. CR 2:23 -cr-00169 -MEMF**

12 UNITED STATES OF AMERICA,                **VICTIM IMPACT STATEMENT OF**
                                            **BASQUIAT VENICE INVESTMENT**
13              Plaintiff,                   **GROUP; EXHIBITS AND**
                                            **DECLARATIONS OF**
14        vs.                               **DR. AARON DEGROF AND MICHAEL**
                                            **KLEIN IN SUPPORT**
15 MICHAEL BARZSMAN,

16              Defendant,                   Date: August 18, 2023

17                                           Hon. Maame Ewusi-Mensan Frimpong

18

19                                           Courtroom: 8B- 8th Floor
                                             Time: 10:00 am.
20

21

22

23

24

25

26

27

28

1

2

3          Pierce O'Donnell, in his capacity as co-manager of the Basquiat Venice Collection

Group ("BVCG"), submits this Victim Impact Statement as authorized under the United States

Department of Justice, Victim Notification Program (updated December 14, 2020.)

4

5          BVCG requests that the attached statement, supporting exhibits, and attached

Declarations of Dr.Aaron De Groft, Director and Chief Executive Officer of Orlando Museum

6   of Art ("OMA"), and Michael Klein, a veteran art curator, gallerist, and author, who witnessed

7   Jean Michel Basquiat paint in 1982. (1960-1988) ("Basquiat"). Basquiat was an American

8   abstract neo-expressionist artist. Michael Klein has been familiar with Basquiat's paintings since

9   around 2015.  Mr. Klein has seen all the 25 Basquiat paintings, whose authenticity is at issue.

10          BVRG respectfully requests that before sentencing defendant Michael Barksman,

11  presently scheduled for August 18, 2023, at 10:00 am, the Court read and consider BVRG's

12  Victim Impact Statement, supporting exhibits, and declarations of Dr. DeGroff and Mr. Klein

(attached in their entirety as Attachment "A")

13          Neither Mr. O'Donnell nor any other representative of BVCG received notice of

14  Defendant's Change of Plea hearing, conducted on May 26, 2023. Respectfully, the important

15  rights of BVCG should not be ignored simply because the other parties failed to comply with

16  the required notice provisions of the United States Department of Justice, Victim Notification

17  Program (as updated December 14., 2020). Mr. O'Donnell is submitting the attached Statement

18  on behalf of BVCG.in order to furnish the Court with information relevant to the crimes

committed by Defendant Michael Barzman and their impact on BVCG.

19

20          August 12, 2023,

21

22                          Respectfully,

23

24                          Thomas J. Nolan
                            Law Office of Thomas J. Nolan, Inc

25

26

27

28

# ATTACHMENT A

**Victim Impact Statement of Basquiat Venice Collection Group**

**Submitted by:**
**Pierce O'Donnell, Co-manager**
**Basquiat Venice Collection Group**

INTRODUCTION ...................................................................................4

EXECUTIVE SUMMARY ....................................................................7

CHARGED AND UNCHARGED CRIMES ........................................10

BACKGROUND FACTS .....................................................................12

FBI INVESTIGATION ........................................................................14

BARZMAN USED TO JUSTIFY PAINTINGS' SEIZURE ...............16

DEVASTING CONSEQUENCES OF THE SEIZURE.......................17

MY VOLUNTARY GOVERNMENT INTERVIEW ..........................19

BARZMAN AND J.F. COULD NOT HAVE CREATED THESE
PAINTINGS .........................................................................................22

A FLUNKING MATH GRADE............................................................26

THE MUMFORD BASQUIATS PROVENANCE IS AUTHENTIC ...28

    1.    Basquiat Was Known To Sell Paintings for Cash Without His
Dealers ...............................................................................30

    2.    Mumford told six persons that the 25 Basquiats belonged to
him. .....................................................................................31

        (a)    Lee Mangan and William Michael Force ................................31

        (b)    Taryn Burns.............................................................33

        (c)    Talin Maltepe .........................................................33

        (d)    Ed Celis ..................................................................34

        (e)    Adriana Trigiani .....................................................35

    3.    Mumford and Basquiat collaborated on an autobiographical
Poem...................................................................................36

A COLLECTION OF SIX EXPERTS HAS FOUND THE 25 PAINTINGS
AUTHENTIC .......................................................................................41

    1.    Diego Cortez (1946-2021) .................................................42

    2.    James Blanco........................................................................43

    3.    Dr. Jordana Moore Saggese ...............................................44

    4.    Dr. Aaron De Groft .............................................................45

    5.    The OMA Catalogue Expert Opinions................................46

        (i)    Dr. Aaron De Groft..................................................47

        (ii)    Michael Klein .........................................................47

        (iii)    James Blanco ...........................................................48

        (iv)    Stevenson Dunn ......................................................48

        (v)    OMA Curatorial Staff .............................................49

THE 25 BASQUIATS ARE DEMONSTRABLY AUTHENTIC ........49

THE NEED FOR AN EVIDENTIARY HEARING .............................51

CONCLUSION ....................................................................................52

## TABLE OF EXHIBITS

1. Appraisal Report

2. FBI Affidavit

3. Bazman and Steakley Sales Records

4. Description of Barzman and Steakley Sales Records

5. Statement of Adriana Trigiani

6. Pierce O'Donnell email to FBI, dated July 21, 2021

7. Barzman's notarized statement, dated February 18, 2013

8. All paintings offered by Barzman to Oslo buyer

9. Fake Basquiats offered to Oslo buyer

10. Declaration of Michael Klein

11. Declaration of Dr. Aaron De Groft

12. Declaration of Leo Mangan

13. Judith Karfiol emails

14. Dunning notice

15. Email from Renee Ortiz to Lee Mangan, dated January 30, 2013

16. Declaration of Talin Maltepe

17. Declaration of Ed Celis

18. The Poem

## NOTE ON SOURCES

This Victim Impact Statement contains numerous supporting citations to documents and other materials.  These include government records such as the Affidavit supporting the request for a search warrant, the Plea Agreement, the Rule 11 plea transcript, sentencing memoranda, internet sources, a website maintained by Basquiat Venice Collection Group, and witness statements and declarations, among others.  For those documents not readily obtainable with a click on the citation, they are collected in an accompanying Compendium of Exhibits which can be accessed at:

https://drive.google.com/file/d/1iHCf4wMhsUmgtnC7_8z92D_qZ51yaixl/view

The Basquiat Venice Collection Group website can be found at www.bvcg.org.  The password is: JMB2023.

# INTRODUCTION

I am Pierce O'Donnell.  I have been a member of the California State Bar since 1978.  I am a trial lawyer with the Los Angeles law firm of Greenberg Glusker Fields Claman & Machtinger.  My curriculum vitae can be found at: https://www.greenbergglusker.com/pierce-odonnell/

I am the co-manager of the Basquiat Venice Collection Group ("BVCG").  BVCG is a California joint venture that owns six paintings attributed to the iconic American painter Jean-Michel Basquiat ("six BVCG Basquiats" or "six paintings" or "our paintings").  As discussed in more detail below, our paintings have a strong provenance, have been authenticated by numerous Basquiat art experts, and have been appraised as a collection for a value of $25 million.  *See* Appraisal Report, dated September 17, 2020 (Exhibit 1) These six paintings can be seen in Exhibit 1 and www.bvcg.org.[1]

This Victim Impact Statement ("Statement") is authorized under the United States Department of Justice, Victim Notification Program (updated December 14, 2020).  I am submitting this Statement on behalf of BVCG in order to furnish the Court with information relevant to the crimes committed by Defendant Michael Barzman and their impact on BVCG, including:

(1)     Under any version of Barzman's false statements under oath discussed below, BVCG and its six paintings are clearly victims of his crimes.

(2)     Barzman's Plea Agreement, filed April 11, 2023 (Dkt. 24), significantly minimizes the seriousness, and catastrophic consequences, of his brazen offenses.

(3)     As demonstrated more fully below, Barzman has made false, misleading, and perjurious statements to Your Honor in his Plea Agreement, dated April 4, 2023 (Dkt 24), and his Rule 11 guilty plea proceeding on May 26, 2023 ("false statements

---

[1])here are seven images because one painting has Images on both sides.

1    under oath").

2        (4)    As co-manager of BVCG and identified in FBI Agent Elizabeth Rivas'

3    Search Warrant Affidavit (Exhibit 2) as someone making allegedly fraudulent

4    representations about the Mumford Basquiats provenance, I suffered the compounded

5    injury of being prominently associated with fake art, my reputation was adversely

6    affected, and my job was put at risk.  In addition, the value of our paintings—once

7    appraised at $25 million before Barzman's treachery—was totally trashed.

8        (5)    Barzman's  false statements under oath have directly and prejudicially

9    impacted our six BVCG Basquiats.

10       (6)    Barzman's unsubstantiated claim that our paintings are among a series of

11   fakes—because a friend (an unnamed "J.F.")[2] and he supposedly painted them along

12   with 19 other paintings attributed to Basquiat ("19 Basquiats")[3] (collectively, "25

13   Basquiats")—is preposterous.  Neither he nor the government has presented any

14   evidence corroborating Barzman's claim that he and his doorman friend painted each

15   of the alleged Basquiat forgeries in 5 to 30 minutes.  No expert has been proffered by

16   Barzman or the government attesting to such wild claims.  More importantly, the

17   mysterious J.F has failed to corroborate Barzman's assertions. As demonstrated

18   below, this Victim Impact Statement references summaries of expert opinions

19   debunking  Barzman's claims that that he and J.F. devoted between 5 and 30 minutes

20   creating each of the forged Basquiat paintings and aged them 30 years by exposing

21   them to the sun.

22       For all of these and other reasons discussed below, I respectfully submit that

23   the interests of justice and the rights afforded crime victims like BVCG warrant

24

25   _____

26   [2]We know J.F.'s true identity.  Because the government chose to hide his name and would not
     disclose it to us for unknown reasons, we will keep his identity a secret *for now.*  As shown below,
     however, the identity of J.F. is highly relevant here and will be furnished to the Court at the
27   appropriate time.  An important issue before the Court is why has J.F.—who is a central character in
     Barzman's fraudulent scheme—has been spared criminal charges.
28   [3]As shown below, the 19 Basquiats have also been authenticated by numerous leading Basquiat
     authorities; they were appraised for $65 million.

deferring Barzman's scheduled sentencing on August 18th and conducting a later evidentiary hearing where BVCG can present evidence disproving Barzman's claim that our paintings are fake and proving that they are correctly attributed to Basquiat.

As explained in more detail below, by falsely and publicly claiming that the 25 Basquiats are fakes and enabling their seizure, Barzman has directly and proximately harmed BVCG by indelibly tarnishing them in the art world and thus rendering them worthless. Unless Barzman recants or is found to be lying, these paintings will forever be doomed as notorious forgeries. That is a crime that must be rectified for the reasons amplified in this Statement.

In enacting the Crime Victims Act, Congress mandated that federal crime victims be given the "right to be reasonably heard at . . . sentencing." 18 U.S.C. § 3771(a)(4). The evidence that BVCG will present is highly relevant to Barzman's sentencing because his false statements under oath bear on several material factors for proper punishment determination, including the seriousness of the offenses, aggravating circumstances, defendant's untruthful characterization of his role in the crimes, defendant's insincere acceptance of responsibility, the impact of the crimes on the victims and society, and the need to provide restitution to victims. *See* 18 U.S.C. § 3553; United States Sentencing Commission, "An Overview of Federal Sentencing Guidelines," https://www.ussc.gov/sites/default/files/pdf/about/overview/Overview_Federal_Sentencing_Guidelines.pdf The mandate that victims voices be heard would be hollow if they are precluded from presenting evidence to substantiate their claims where, as here, the issues are hotly contested.

I have set forth below a summary of the facts substantiating the truth about Barzman's false statements and his lies and the need for this Court to prevent a miscarriage of justice. As requested above, the Court can right this wrong by deferring Barzman's sentencing and conducting an evidentiary hearing where BVCG will be able to present evidence and cross-examine Barzman, J.F., and others. We are

1  very grateful for the opportunity to present this information that we hope will lead the

2  Court to conclude that BVCG is the victim of Barzman's fraud on the Court and is

3  deserving of relief in the form of an evidentiary hearing to disprove Barzman's

4  claims and establish the paintings' authenticity.

5                    **EXECUTIVE SUMMARY**

6          Defendant Michael Barzman 's factual account of his crime as set forth in both

7  his Plea Agreement and Rule 11 statements raise serious questions as to the

8  truthfulness of his account of the breath of his criminal scheme.  Barzman now

9  asserts that he and a friend J.F.  painted the 25 Basquiat paintings that the FBI seized

10  off the walls of the Orlando Museum of Art.  He also earlier lied to the FBI in June

11  2022 when he told them that he did not sell paintings attributed to Basquiat purchased

12  out of the storage locker of famed tv writer Thaddeus Q. Mumford, Jr.  Barzman's

13  flat denial during his June 2022 interview of his purchase of any Basquiat works from

14  the abandoned storage locker of a confirmed acquaintance of Basquiat furnished the

15  probable cause that the paintings' owners were misrepresenting their provenance,

16  thereby directly leading to the issuance of the search warrant and paintings' seizure.

17          Contrary to Barzman's and the government' s representations at the Change of

18  Plea Hearing, BVCG, as the owner of six of the Basquiat paintings, is indeed a victim

19  of Barzman's crime.  Yet, we were not provided notice of the May 26, 2023 hearing.

20  Barzman's account of his criminal conduct raises serious questions as to the accuracy

21  of the record which this Court has been provided and upon which it is being asked to

22  make a sentencing determination.  As described more fully below, Barzman's actions

23  in this matter have had devastating, lasting consequences and warrant more serious

24  charges than a single count Information charging false statements to the FBI.

25          Desiring to set the record straight and furnish the government with significant

26  and persuasive evidence about Barzman's lies, I insisted upon meeting with the FBI

27  and prosecutor.  At the August 3, 2022 meeting, I furnished  sales records, emails,

28  and payment documents showing that Barzman in fact sold the Basquiats to BVCG's

owners in late 2012 and represented that they came from Mumford's storage unit.  I also furnished the government with emails from Barzman to a buyer in Oslo, Norway offering him numerous paintings that he represented were sourced from Mumford. The photos attached revealed that 13 were our authentic Basquiats and nine were obvious fakes.

There is no possible way that Barzman and his crony J.F. painted the 25 Basquiats.  Barzman was a storage locker scrounger and  J.F was a nightclub bouncer who reportedly sells Christmas trees for a living.  Neither has any known education, training, or experience as an artist—much less one of the talent who could paint convincing Basquiat forgeries in 5 to 30 minutes as Barzman claims.

Further, it *is* conceivable that this duo mass produced the nine Oslo fakes in 5 to 30 minutes.  They are so pathetically amateurish and do not even remotely resemble authentic Basquiats.  As two renowned Basquiat experts have declared, the persons who painted these self-evident forgeries could not (and did not) paint our 25 paintings.

One notable example of Bazman's inherent inability to tell a consistent story is his contradictions about one of the most fundamental aspects of his crime—the number of his fakes.  Barzman is all over the place, furnishing the Court with no fewer than five versions.  In the Affidavit and his Plea Agreement, he says that the number is nine, ten, 20, 20 to 30, and "most of" 25.  His breathtaking failure to give only one number (after all he supposedly created and sold them) is the nail in the coffin of his credibility.

Not only does our evidence doom the Barzman fakes provenance claims, it proves that the 25 paintings are brilliant works of Basquiat that Mumford purchased and stored away.  Among other things, Mumford told *no fewer than six credible persons* between 2013 and 2017 that he befriended Basquiat in 1982, purchased numerous cardboard paintings from him for $5,000, did not like them and therefore stuck them in his storage locker—only to lose the paintings to auction when he was

1  for several years in arrears in paying his storage fees.  What Mumford told each
2  person is consistent and believable as we witness the poignant sadness of this
3  accomplished man coming to painful grips with this loss in the last challenged years
4  of his storied life.

5  In a constellation of illuminating evidence, the most brilliant is a Poem on
6  which Mumford and Basquiat collaborated.  Replete with meaningful
7  autobiographical references and actually mentioning "25 paintings," the Poem is
8  initialed "JMB."  Two forensic handwriting experts have identified Basquiat as the
9  person who penned "JMB."

10  The most gripping provenance evidence comes from the literary superstar
11  Adriana Trigiani.  A multiple *New York Times* bestselling author, television and film
12  writer, director and producer, she was a colleague and friend of Mumford in
13  Hollywood.  When she asked him for some documentation that he bought the
14  paintings from Basquiat, he gave her the Poem.  Trigiani has signed a statement
15  attesting to this fact.

16  The 25 Basquiats have been closely scrutinized by Basquiat experts.  Every
17  one of them—*six in all*—found them to be authentic and among his finest paintings.
18  The have put their opinions in writing in the form of reports or essays in the
19  impressive Orlando Museum of Art exhibition catalogue entitled *Heroes & Monsters*.
20  I am unaware of any contrary written opinions about all 25 paintings by any reputable
21  Basquiat expert.

22  It is a glaring omission that neither Barzman nor the Government has provided
23  the Court with any expert opinion confirming that an untrained artist could produce
24  the forged Basquiat paintings and do so with only 5 to 30 minutes of effort per
25  painting.  Nor has the Court been furnished any sworn statement from  J.F attesting to
26  the fact that he participated with Barzman in the creation of the Basquiat forgeries.
27  Indeed, in the Plea Agreement, Barzman could not even identify which of the 25

28

1  Basquiat paintings on exhibit at the Orlando Museum of Art were in fact "painted" by
2  him and his sidekick.

3        This wealth of evidence summarized in this Victim Impact Statement
4  demonstrates that Barzman is not telling the truth that the 25 Basquiats are
5  counterfeits created by the doorman/Christmas tree vendor and him.  When the
6  fundamental issue of the nature, seriousness, and impact of the defendant's crime is
7  disputed, the right for a victim like BVCG to be reasonably heard necessarily requires
8  the right to present evidence.  Respectfully, the Court has ample authority (and
9  reasons) to defer Barzman's sentencing until an evidentiary hearing can be conducted
10 to determine the truth.  This will be the only chance that BVCG will have to obtain
11 restitution of the legitimacy of its paintings.  I urge Your Honor to allow us the
12 chance to prevent a serious injustice to the authenticity of the paintings that will
13 render them worthless.

14                        **CHARGED AND UNCHARGED CRIMES**

15       I need to set the stage here so the Court can understand the context in which
16 this Statement arises.

17       The Plea Agreement obligated Barzman to plead guilty to an Information
18 limited to one count of making selective false statements to the FBI on two separate
19 occasions, in violation of 18 U.S.C. § 1001(a) (2).  Page 2 of Barzman's Information
20 contains a paragraph styled, "Section B. 'FALSE STATEMENTS'" and specifies
21 only false statements made by Barzman during FBI interviews conducted on "August
22 18 and October 13, 2022."  Barzman's lies were his denial of any knowledge about
23 origins of the paintings, including emanating from Mumford's storage unit.  The
24 Information (p. 2) alleges that these false statements were made "for the purpose of
25 influencing an FBI investigation in the Central District of California, knowing that
26 these statements were untrue."

27       But we know that these were not Barzman's only false statements.  The August
28 18th and October 13th false statements were preceded by false statements in his first

                                        10

1    FBI interview on June 14, 2022 as part of the government's longstanding

2    investigation of the paintings.  *See* Exhibit 2 (FBI Affidavit). In fact, the Plea

3    Agreement (at page 9, lines 11 through page 10, line 15) explicitly chronicles the

4    substance of Barzman June 14th false statements in which he first denied any

5    knowledge of paintings from Mumford's locker.

6          Now what is the significance of this?  What the Court was not told is that the

7    government  used Barzman's first lies on June 14th as the cornerstone for FBI Agent

8    Elizabeth Rivas' June 23, 2022 Affidavit in Support of An Application Under Rule

9    41 For A Warrant To Search and Seize (Exhibit 2).  Agent Rivas pointed to

10   Barzman's denials to establish probable cause that the paintings' owners were

11   misrepresenting the paintings' provenance as originating in Mumford's locker.  And

12   this was the warrant authorizing the seizure of the 25 paintings off the OMA's walls a

13   mere week before the exhibition was closing.  *But for Barzman's June 14th lies, no*

14   *search warrant could have been issued*.

15         At the evidentiary hearing, we want to explore why Barzman was not charged

16   with lying to the FBI on June 14th when (as discussed below) the government had in

17   its possession by the time of the Plea Agreement in *March of this year* extensive

18   documentation furnished by me *in August 2022* showing that Barzman in fact

19   purchased the paintings from Mumford's storage unit and sold them to BVCG's

20   owners.  While the government has discretion in making charging decisions, it does

21   not have the right to suppress information bearing on the lack of probable cause and

22   the ruinous consequences of the resulting seizure of the 25 Basquiats.  This egregious

23   fact alone demonstrates how much BVCG has been victimized by Barzman.

24

25

26

27

28

11

# BACKGROUND FACTS[4]

Jean-Michel Basquiat (1960-1988) was an American abstract neo-expressionist artist whose all-too-brief career catapulted him to international acclaim.  In his lifetime, he created several thousand paintings and drawings using various media and substrates (canvas, paper, wood, cardboard, walls, doors, refrigerators, football helmets, and others).  At the time of his death, his paintings were routinely praised and in high demand.  Basquiat changed the art world. https://www.madridacademyofart.com/blog/jean-michel-basquiat

Since his death, Basquiat's paintings have skyrocketed in value.  In private sales and at auction, his works have garnered impressive prices.  In 2017, an untitled painting from 1982[5] sold for $110.5 million.  https://www.myartbroker.com/artist-jean-michel-basquiat/record-prices/jean-michel-basquiat-record-prices   His works on cardboard have also sold for a great deal of money—one from 1982 selling for $8,647,500.  *See* Krieger, Basquiat's Historic Use of Cardboard (www.bvcg.com) ("Krieger")[6]

Basquiat liked Los Angeles and visited the city several times. https://www.latimes.com/archives/la-xpm-2005-mar-13-ca-basquiat13-story.html  He made at least two trips here in 1982.  Following a sell-out exhibition in early 1982, he returned to begin painting for another exhibition set for early 1983. Basquiat was

---

[4]The information in this section can be found in numerous public internet references and particularly in a report prepared for BVCG by Dr. Jordana Moore Saggese, dated November 30, 2017 (Dr. Saggese Report).  www.bvcg.org.   As discussed below, Dr. Saggese is the leading academic scholar on the works of Basquiat.  In her report, after personal examination of the works and extensive research, she found that the six BVCG paintings were by Basquiat's hand and could be attributed to him.

[5]The 25 Basquiats here were also painted in 1982, a year of extraordinary creativity during which he is considered to have produced his best works.  *See, e.g.,* Alexxa Gotthardt, "What Makes 1982 Basquiat's Most Valuable Year," *Artsy* (April 1, 2018) *https://www.artsy.net/article/artsy-editorial-1982-basquiats-valuable-year*

[6]Like other famous artists before him (Picasso, Miro, Vuillard, Toulouse-Lautrec and Degas), Basquiat used cardboard as a substrate for his paintings.  *See* Krieger, *op. cit.*  The use of cardboard does not necessarily devalue a painting.  Munch's famous *The Scream* is painted on cardboard—it sold at auction in 2012 for $120 million.  https://www.nytimes.com/2012/05/03/arts/design/the-scream-sells-for-nearly-120-million-at-sothebys-auction.html

1  fond of partying and was a drug user.  Despite some limited financial success, he was

2  always in need of money to support his night life.

3  https://civilianreader.com/2016/05/10/excerpt-basquiat-a-quick-killing-in-art-by-

4  phoebe-hoban-open-road-media/

5          Thaddeus Q. Mumford, Jr. (1951-2018) was a celebrated television creative

6  artist.  A pioneer in many ways, he was the first African-American batboy for the

7  New York Yankees.  https://interviews.televisionacademy.com/news/from-yankees-

8  batboy-to-roots-the-next-generations-thad-mumford-broke-new-ground  Winner of an

9  Emmy (out of an impressive five nominations), Mumford was one of the most

10  acclaimed and sought after writers of comedy and drama.  His credits include writing

11  and/or producing for *M\*A\*S\*H, The Cosby Show, Maude, Sesame Street, The*

12  *Electric Company, Saturday Night Live, Alf, Coach, Good Times, A Different World,*

13  *Home Improvement, The Duck Factory, and Roots: The Next Generation*, among

14  others.  https://www.imdb.com/name/nm0612588/  Mumford was also known as an

15  avid art collector.  *See* Exhibit 5 (Statement of Adriana Trigliani)

16          This is where the story diverges.  There are two competing scenarios involving

17  the 25 Basquiats.

18          *One version provides that in 1982, Basquiat was befriended by Mumford in

19  Los Angeles, and he gave him $5,000 in exchange for more than two dozen paintings

20  on cardboard and one on plywood.[7]  Not a fan of this type of art, Mumford put the

21  paintings in his Los Angeles storage locker where they remained until 2012 when

22  they were purchased by Mike Barzman, a local small-time auctioneer, after Mumford

23  ran up about $7,000 in unpaid storage fees.  Barzman then sold the paintings to two

24  persons for about $15,000, and these purchasers assigned their ownership rights to

25  BVCG in 2017.

26  _____

27  [7]While his paintings were starting to sell for decent prices in 1982, Basquiat was always strapped
   for money.  The fact that Basquiat always needed cash for partying and drugs helps explain why he

28  circumvented his gallerists, and "he liked to be paid for works of art quickly in cash."  M. Franklin
   Sirmans, "Chronology," in *Basquiat*, ex cat. (Basel, Switzerland:  Beyeler Foundation, 2010), p. 48.

*The alternative story is that Mumford never knew, or purchased any paintings from, Basquiat; there were never any Basquiat paintings in Mumford's storage locker; Barzman never purchased any art works out of Mumford's storage unit; and anyone who is claiming that this is the provenance of the 25 paintings is not telling the truth.  The recent wrinkle to this narrative is Barzman's claim that not only did he not purchase any art from Mumford's locker, but his pal J.F. and he in fact painted the 25 paintings.  In short, all 25 paintings are fakes.[8]

Which of these dueling narratives is the truth is the central question here.

I respectfully submit that based on the overwhelming evidence summarized below, the most credible scenario is the first one—Barzman bought the 25 Basquiat paintings from Mumford's locker and sold them to the two persons with the representation that they were attributable to Basquiat and sourced from the famous television writer's storage unit.  Barzman and friend no more painted them than I did.  What they did do, however, was (1) manufacture numerous fakes and sell them to a buyer in Oslo, Norway and (2) falsely claim that our authentic 25 Basquiats are included in his body of fakes.[9]

## FBI INVESTIGATION

In February 2022, the Orlando Museum of Art ("OMA") opened an exhibition entitled *Heroes & Monsters* featuring the 25 Basquiat paintings.  The paintings' owners lent them to OMA for no fee, and OMA paid for all shipping, insurance, installation, catalogue preparation and printing along with other expenses for the exhibition.  An elaborate exhibition catalog—with essays by art historians, gallerists, curators, and scholars praising the works as authentic Basquiat masterpieces—was

---

[8]Curiously, Barzman, while stating that he forged *and* sold the paintings, did not cop a plea to selling his forgeries to anyone in particular.  So, we are left with this unexplained mystery: from whom did the purchasers acquire these 25 paintings if not Barzman?
[9]The most likely sequence of events here is that Barzman bought the 25 paintings from Mumford's locker, sold all of them to BVCG's owners, and decided to make more money by using the real Mumford provenance to sell his additional,newly-minted fakes to the unsuspecting foreign buyer discussed below.

1  prepared.  www.bvcg.org  The show attracted thousands of visitors and set OMA

2  attendance records.

3       On June 24, 2022, a team of FBI agents seized the 25 Basquiat paintings off

4  the OMA's walls.  The seizure was pursuant to a search warrant that was obtained by

5  submission of an Affidavit by FBI agent Elizabeth Rivas, dated June 22, 2022 ("FBI

6  Affidavit") ( Exhibit 2).  The FBI raid was covered by awaiting media, and the news

7  spread like a prairie fire around the world in both the general and art-related media.

8  *See, e.g.,* https://www.nytimes.com/2022/06/24/arts/design/fbi-orlando-museum-

9  basquiat.html; https://www.clickorlando.com/news/local/2022/06/24/fbi-raids-

10 orlando-museum-of-art-seizes-basquiat-art-exhibit-museum-

11 says/https://www.theartnewspaper.com/2022/06/27/fbi-raid-orlando-museum-art-

12 basquiat-paintings-authenticity  The *New York Times* article did not mince words

13 about the dire implications of the FBI's move:

14
15           "An affidavit filed to secure the search warrant called the collection's
            origin story, as it had been described by its owners and the museum, into
16          question, and noted that there was reason to doubt the authenticity of the
            art works."

17 https://www.nytimes.com/2022/06/24/arts/design/fbi-orlando-museum-basquiat.html

18       According to the FBI Affidavit, the agency had been investigating these 25

19 Basquiats since 2013.  Exhibit 2, p. 13. Why the FBI waited a decade to seize them

20 has never been explained—especially since Mumford supposedly told them as early

21 as 2014 that these were not his paintings.  *Id.*, pp. 13-14.  Indeed, the Affidavit

22 reveals that the agency did not interview key witnesses—including Barzman—until a

23 short time before the dramatic seizure.

24       The Affidavit's stated premise for the justification for a search warrant was

25 serious doubts about the paintings' provenance that drew into question their

26
27
28

15

authenticity.  If the owners were lying about the origin of the works,[10] that was probable cause to suspect a crime was being perpetrated and thus justified seizing the works. By a parity of reasoning, however, if that putative evidence of the owners lying was false, there should have been no seizure.  So, what was the supposed evidence that led to this contention?

None other than one Michael Barzman himself.

### BARZMAN USED TO JUSTIFY PAINTINGS' SEIZURE

The Affidavit states that the FBI interviewed Barzman on June 14, 2022, asking him point blank what he knew about the 25 paintings.  He unequivocally stated that he knew nothing about them, and when shown photos of the 25 paintings in the OMA exhibition, he flatly denied ever seeing them before.  Here are his exact words.

1. "About ten years ago, [he] sold approximately 10 pieces of artwork to three individuals"—Lee Mangan, Taryn Burns, and William Force. (Para. 32 (a)); *see also* para. (32 (g))

2. Years after the purchase, Mangan, Burns, and Force asked him "to say that the artwork was found in Mumford's storage locker, which [he] said was not true and he could never say." (Para. 32(c))

3. "[Barzman] was shown a notarized statement he was alleged to have signed on February 13, 2013. [Barzman] said that he may have signed the document, but the contents were not correct.  He could never say from which particular locker/unit he acquired any item because he bought things from so many different places." (Para. 32 (d))

4. "[Barzman] said at the time he may have signed a document because he was new in the business and did not realize what they were doing." (Para. 32 (e))

5. "[Barzman] was shown images of 20 pieces attached to his declaration and he did not recognize any of the artwork." (Para. 32 (g))

---

[10]In several places, the Affidavit states that the owners of the 25 paintings were making false representations about the paintings emanating from Mumford's storage locker.  *See* Exhibit 2, pp. 9-10, 16-18.

16

6.      "[Barzman] was shown images of the entire collection at OMA and he did not recognize any of the artwork." (Para. 32 (g))[11]

On the strength of Barzman's statements to the FBI disclaiming any knowledge about the 25 paintings, the Affidavit concluded that persons were attempting to sell them "using false provenance . . . ."  Para. 5. , and the search warrant was obtained.

## DEVASTING CONSEQUENCES OF THE SEIZURE

With the avalanche of worldwide negative publicity[12], the fallout from the raid was immediate, devastating, and widespread.

*The owners' reputations were impugned by their association with supposedly fake paintings on such a grand scale of not one or two, but 25, supposed Basquiats. Personally, I had to hire a lawyer Thomas J. Nolan, a former Assistant United States Attorney for the Central District of California where he served as Chief of the Fraud and Special Prosecutions Unit . I had to also explain to my law firm, clients, investors[13], family, and friends as best I could that I had done nothing wrong; I still believed in good faith that our six BVCG Basquiats were authentic based on my extensive due diligence; and I was cooperating with the FBI.  I was distressed and anxious about an FBI investigation and the potential implications for my career and finances.

*We no longer had possession of our paintings and could not arrange for other museum or art gallery exhibitions nor could we sell them.

---

[11]Barzman admitted that he had purchased the contents of a storage locker belonging to Mumford. *Id.,* para. 32.  He further stated that the locker contained some Mumford sports and entertainment memorabilia which he sold.

[12]As the government acknowledges, the seizure of these paintings has garnered "substantial publicity." Dkt. 29, p. 9.

[13]In order to pay for experts, storage, and other necessary costs, I raised over $350,000 from close friends and family who acquired a preferred profit participation interest in BVCG, and I loaned about $100,000 to BVCG.  My wife was an investor for $35,000.  Thus, our family has lost nearly $150,000.

1         *The distinguished OMA Director and Chief Executive Officer, Dr. Aaron De

2   Groft, who has consistently championed our paintings' authenticity, was abruptly

3   terminated.

4         *The OMA's accreditation was suspended, and its Board Chair was forced to

5   resign.

6         *The value of our paintings was totally destroyed.  No one would purchase

7   them, and no museum or art gallery would exhibit them.  They might as well have

8   been consumed by a fire.  It is no exaggeration that if the art world had a Hall of

9   Shame, our paintings would be permanently enshrined there.

10         *There was also an element of helplessness.  As a trial lawyer, I had devoted

11   my career to determining disputes in a courtroom where due process, fairness, and the

12   rule of law reigns.  What could I do to set the record straight that our Basquiats were

13   not fakes and its owners were not fraudsters?  Where was a forum providing a

14   legitimate opportunity for an adversarial process to prove their authenticity?[14]

15         As discussed below, my frustration with having no immediate avenue to deal

16   with the paintings' seizure was compounded by Barzman's later false claim in his

17   plea that our paintings were fakes—an announcement that also garnered global

18   publicity and was perceived as confirming the justification for the FBI's raid.

19   Virtually every article now calls our paintings "fakes" or "counterfeits" *See, e.g.,*

20   https://melmagazine.com/en-us/story/counterfeit-basquiat-painter;

21   https://patch.com/florida/orlando/orlando-museum-art-victim-basquiat-counterfeit-

22

23

24   _____

25   [14]The search warrant here was merely based on a probable cause determination without any input
from the paintings' owners.  I was not interviewed, and only one of our many experts was

26   interviewed, and she confirmed in the Affidavit that she had told me in her report (discussed below)
that our six Basquiats had been painted by Basquiat.  *See* Dr. Saggese Report (www.bvcg.org)  And

27   as noted below, the star witness Barzman—who apparently was not requested by the FBI to produce
any documents substantiating his claims—lied about his lack of any knowledge of our paintings.

28   Barzman furnished the government with the supposed evidence to claim that the owners were
falsifying the provenance when they represented that Barzman had sold them the paintings after
purchasing them from Mumford's storage unit.

scheme-doj  How could we prove that Barzman had perjured himself about our paintings' illegitimacy?  Hopefully, the Court will provide us that opportunity.

## MY VOLUNTARY GOVERNMENT INTERVIEW

Shortly after the raid, Mr. Nolan contacted Mark Williams, the Assistant United States Attorney in Los Angeles in charge of the case.  Mr. Nolan advised him that he and I wanted to meet with the FBI and  furnish them with significant evidence relevant to the Government's investigation.  AUSA Williams advised that I was not a target of their investigation and Mr. Nolan advised that I did not want any form of immunity in exchange for my willingness to talk with them. AUSA Williams confirmed after my interview.[15]

In preparation for my meeting, I gathered all the information that I could find in my files and my computer relating to our BVCG Basquiats, starting in the spring of 2017 when I began working on the project.  Particularly, I gathered documents relating to the sale of the 25 Basquiats to William Michael Force ("Force") and Lumsden (Lu) Quan ("Quan") in 2012 who purchased them from Barzman and later assigned their ownership rights to BVCG in 2017.  Fortunately, I was able to capture the email traffic relating to the sale.

I also retrieved emails in 2013 between Taryn Burns, Force's life partner, and Judith Karfiol, who had been Mumford's attorney and also acted as the liaison in arranging for a meeting with Mumford, Force, and Lee Mangan.

I also downloaded emails between me and Jonas Leborg, an art dealer in Oslo, Norway who contacted me in mid-2022 as a result of the negative publicity regarding our Basquiats.  Mr. Leborg informed me that his client had purchased five paintings on cardboard from Barzman in late 2012—paintings that Barzman represented to his client came from Mumford's locker and were attributable to Basquiat.  Mr. Leborg

---

[15]Immediately after learning about the FBI subpoenaing OMA records about our paintings and the upcoming OMA exhibition, I sent an email to the FBI on July 21, 2021, stating that I wanted to speak with them about the government's investigation.  *See* Exhibit 6.  I never received a response. Nor did Mr. Mangan's attorney who made a similar offer.

1  sent me photos of the five paintings plus photos of other paintings and drawings—22

2  cardboard paintings altogether—that Barzman represented had also come from

3  Mumford's locker and were attributable to Basquiat.  Some of the offerings were

4  among the 25 Basquiats, and others appeared to be obvious fakes.  *See* Exhibit 8.

5  I prepared a PowerPoint presentation which contained 245 slides that included

6  all the foregoing documents and photos as well as other information that I believed

7  relevant to the government's investigation.

8  On August 3, 2022, Mr. Nolan and I met with AUSA Williams, and FBI

9  Special Agents Elizabeth Rivas (who had signed the Affidavit,) Allen Grove, and

10  another Assistant United States Attorney whose name I do not recall and did not take

11  an active role during the interview. The interview lasted more than four hours.

12  Special Agent Grove did most of the questioning.  I consented that the interview

13  could be recorded and I answered all their questions as best I could.  I gave them an

14  electronic and hard copy of my PowerPoint.

15  A major thrust of the discussion was my presentation of the documentary

16  evidence demonstrating that Barzman had lied in the Affidavit.  My records proved

17  that Barzman and his partner Matthew Steakley had in fact sold each of the 25

18  Basquiats to Force and Quan for about $15,000.  Exhibit 3 contains copies of sales

19  records from Barzman and Steakley, including a bill of sale, emails, invoices, PayPal

20  receipts, and a check.  Exhibit 4 is a description of these records and their

21  significance as explained by me in the meeting.  These documents indicate that both

22  Barzman and Steakley told Force, Quan, and Burns that the paintings came from

23  Mumford's storage locker at Ortiz Bros. Moving & Storage in Los Angeles.

24  Perhaps the most incriminating document is the first communication from

25  Steakley to Quan on Mike Barzman Auctions letterhead—an email dated October 11,

26  2012, attaching a Bill of Sale, where Steakely tells Quan in part:

27

28  "This is a Bill of Sale for a *Jean Michele [sic] Basquiat done on Card
    Board.* This is not a print or lithograph, this is *an actual painting* with a
    signature that reads 'Jean Michele [sic] Basquiat and Samo on some.

*The provenance of this piece is it belonged to a man by the name of Tad [sic] Mumford who lived in NYC most of his life.  I purchased his entire Art and Baseball memorabilia collection and this is the first piece of artwork that I am selling."*
Exhibit 3 (emphasis added)

I brought to the interview additional evidence showing Barzman marketing the Mumford Basquiats.  At the same time that he was offering the real ones to Force and Quan, he is offering some of the genuine ones and some poor counterfeits to the buyer in Oslo, Norway.  I gave the government this email traffic.  *See* Exhibit 8.

I also gave the government a notarized statement signed by Barzman, dated February 18, 2013—a few months after he sold the 26 Basquiats to Force and Quan. *See* Exhibit 7.  At the time, Mangan had 20 of the paintings in his possession, and Force and Quan had the others.  In his notarized statement, Barzman states that on May 17, 2012, he "purchased the contents of storage locker – lot #2125 located at Ortiz Bros. Moving and Storage which address is 141 W. Avenue 34, Los Angeles California 90031."

Barzman's statement also provides: "To my knowledge, the contents of the storage locker - lot #2125 were owned by a Mr. Thadeus [sic] Mumford."  Barzman concludes by referencing "23 pages of photographs" attached to his statement, noting that they "are most, if not all, of the contents from storage locker – lot #2125."  To his notarized statement, Barzman attached photos of Mumford's memorabilia relating to being a batboy for the New York Yankees, his writing for, and association with, *M*A*S*H*, and his television writing awards.  Barzman also attached photos of the front and back of 20 paintings that are among the 25 Basquiats.

The documentary evidence that I furnished the government graphically confirms that Barzman lied to the FBI as recounted in the Affidavit.  At the meeting, Mr. Nolan and I and I could tell that the FBI did not have the evidence about Barzman and Steakely selling the paintings to Force and Quan or the Oslo fellow. We expressed the view that our nformation blew a gaping hole in the Affidavit and a

critical basis for the assertion of probable cause, *i.e.*, Barzman's storage locker never contained any paintings attributed to Basquiat.

The government could no longer adhere to the story that Barzman was not connected with our Basquiats.  What the government did after my interview seems to be revealed in the Plea Agreement which states that only two weeks afterwards, the Special Agents of the FBI again interviewed Barzman.  Whether they confronted him with the foregoing damning evidence then (or in the later interviews) is unknown.

But what we do know is that Barzman's claim that J.F. and he painted the 25 Basquiats is flatly contradicted by his admissions in the sales records and his voluntary, uncoerced notarized statement.  We have here furnished the Court with conclusive proof that our paintings are the victim of a false claim that they are fakes and the justification for an evidentiary hearing to sort out the truth.

**BARZMAN AND J.F. COULD NOT HAVE CREATED THESE PAINTINGS**

Besides the evidence that Barzman lied multiple times to the FBI and has no credibility, his story that his buddy and he painted our Basquiats is a preposterous fiction for several reasons.

First, Steakely has not been accused of any crime here such as painting fakes or a conspiracy with J.F. and Barzman.  As we have seen, his October 11, 2012 email truthfully acknowledges that the Mumford Basquiats provenance story is accurate. *See* Exhibits 3, 4.

Second, Barzman's notarized statement, dated February 18, 2013—admitting that he obtained the paintings from Munford's storage vault—corroborates Steakley's account of the Mumford provenance.  *See* Exhibit 7.

Third, Bazman's explanation of how he devised a supposedly phony link between Mumford's storage locker and Basquiat paintings strains credulity.  He claims that in 2012 he had purchased contents of Mumford's locker and "used the acquisition of Mumford's stored items to create a false [Basquiat] provenance for the Fraudulent Paintings."  Plea Agreement (Dkt. 24), p. 8.  Now, one might ask, why

Basquiat?  Why not any number of often forged artists like Picasso, Rothko, or Pollock?  Or if you are going for the African-American artist angle, why not Sam Gilliam, Faith Ringgold, or Kerry James Marshall?

The fact of the matter is that Barzman never lets us in on the secret about his reasoning process.  This makes sense for one simple reason: he did not have to invent an association with an artist because he bought paintings that Steakley and he attributed to Basquiat.  It's Occam's razor.

Fourth, Barzman and J.F. are the least likely Basquiat art forgers imaginable. Neither has any known education, training, or experience as artists.  There are no known exhibitions anywhere of their works, and an internet search yields nothing along these lines.  Barzman is a storage locker buyer and auctioneer while J.F. has been a doorman at Los Angeles night clubs and reportedly a Christmas tree salesman. A longtime Los Angeles gallery owner who knows J.F. has never seen any of his paintings or heard of him painting any.  No one has.  In short, there is a greater likelihood that my talented 13-year-old granddaughter painted our 25 Basquiats than these two imposters.

Fifth, every expert whom I consulted quickly concluded two things:

(1)     Out of the 22 paintings and drawings offered to the Oslo buyer, 13 are our Basquiats and the 9 others are obvious fakes ("the 9 Oslo fakes").  (The identified fakes can be found in Exhibit 9.)

(2)     The person(s) who created the 9 Oslo fakes did not paint our 25 Basquiats fors everal reasons, including but not limited: (a) they have none of the look, feel, or effect of genuine Basquiats from 1982; (b) they are poor drawings and crude imitations of Basquiat's hallmark golden three-pointed crown; (c) there is an oafish attempt to draw eyes, mouths, and skeleton elements indicative of Basquiat's works; (d) we see an amateurish effort to replicate Basquiat's trademark buildings; and (e) the forgery of Basquiat's signature is sloppy.  *See* Exhibit 10 (Declaration of

1    Michael Klein); Exhibit 11 (Declaration of Aaron De Groft).

2        I have furnished two expert declarations for the Court.

3        Dr. Aaron De Groft is a distinguished art historian with 35 years' experience as

4    a museum curator, author, lecturer, and museum director.  Dr De Groft has personally

5    examined the original 25 Basquiats, he approved them for the OMA Heroes &

6    Monsters exhibition, and he has studied images the 9 Oslo fakes.  His curriculum

7    vitae can be found attached to his declaration.  Dr. De Groft states:

8
9        "The 9 Oslo fakes do not come remotely close to resembling genuine
         Basquiat works.

10       "Two of the drawings (page 5 of Exhibit 9) are cluttered, demonstrating
         none of Basquiat's remarkable sense of space and perspective.
11
12       "These forgeries lack any sense of theme or purpose—how the artist is
         trying to speak to us. One fake with mostly a brownish color and a
13       crown (not remotely close to a real Basquiat crown) has no evident
         purpose other than to fill up the cardboard.

14       "The multi-colored fake with some feet, vague torso, and black ink blot
         head, with floating blue paint dabs—on page 3 of Exhibit 9—is a
15       farcical attempt at imitating Basquiat. It is really embarrassing.

16       "The drawing with the two heads (page 5 of Exhibit 9)is not even
         remotely close to any authentic Basquiat. The nostrils, eyes, and mouths
17       are misshapen—almost as if the forger never before saw images of
         genuine Basquiats.
18
         "That these are fakes is not even a close question."
19   Exhibit 11.

20       A second expert is Michael Klein, an eminent art authority who has spent 50

21   years as a museum curator, gallery owner, consultant to artists' estates, and author.

22   Klein personally observed Basquiat painting in New York in 1982, and he worked on

23   an exhibition of 20 of the Basquiats that did not materialize.  Klein has studied the

24   originals of the 25 Basquiats, and he has studied the images of the 9 Oslo fakes.  His

25   curriculum vitae can be found attached to his declaration.  Mr. Klein observes:

26
27       "What captured the imagination of dealers and collectors in the 1980s
         was the intensity and seemingly naive slant of Basquiat's works. His
         sense of space and color was admirable as was his use of language and
28       the imagery of New York City buildings and the towers of public

24

housing, street signs and runaway dogs. These are utterly absent or oafishly portrayed in the Oslo fakes.

We see nothing of the distinctive look and feel of genuine Basquiats. There is no effect that draws you to the work in a joyful desire to look for its meaning and truth for you.

When it comes to faces and figures, one of the Oslo fakes (page 3) shows faces that are blank or filled in with black.  In sharp contrast, Basquiat's works always contain an intensity in the eyes and an energy in the figures giving the figure its character or persona. The gallery of Oslo fakes shows faces with blank stares and hollow eyes.  This was not Basquiat's style or way of creating characters.

The Oslo fakes totally miss capturing Basquiat's caged mouths and skeletal elements.  The three-pointed crown is oddly depicted.  The signature seems to have been traced.

Basquiat was also self-taught by looking at other painters' works such as Franz Kline and Cy Twombly.  Thus, anything attempting to be abstract is a mess and not displaying the intuitive layout that Basquiat understood was needed in a great painting.

There is so much more wrong with the Oslo fakes. The three drawings don't even come close to a poor copy."

Exhibit 10.

Klein also observes that "the person(s) who painted the former could not and did not paint the latter.  The degree of sophistication, drawing ability, layering of paints, themes, motifs, and themes in the 25 Basquiats are totally lacking in the forgeries." *Id.*

Two statements by Barzman in his Plea Agreement (page 10) caught both experts' attention:

(1)     J.F. spent a maximum of 30 minutes and as little as 5 minutes on each painting.

(2)     After finishing the images, they put them outdoors "to expose them to the elements and thus create an aged appearance consistent with works made in the 1980's when Basquiat was painting."

Dr. De Groft and Klein found these statements absurd for several reasons:

(1)     The 9 Oslo fakes look like they could have been dashed off (hurriedly

mass produced) in 5 to 30 minutes each since they are crude at best imitations of Basquiat's body of work.

(2)     It would take an accomplished forger a lot longer than a few minutes to paint any of the 25 Basquiats.

(3)     None of the 25 Basquiats are fakes.

(4)     Exposing paintings on cardboard "to the elements" would not age them 30 years (1982 vs. 2012), and this is not even a recognized aging process—especially as it appears that J.F. did not leave them outside for very long.

(5)     Several condition reports for the 25 Basquiats found them in excellent condition and not in any way faded, damaged, or otherwise indicative of being left outdoors.   *See* Exhibit 1 (Appraisal), p. 27 ("very good condition"); Dr. Saggese Report, p.33 ("all [are] in excellent condition considering the reported age"); Appendix C (condition reports) www.bvcg.org.; *See* Exhibit 10, Exhibit 11.

In sum, these two experts agree that the forgers of the 9 Oslo fakes did not paint any of our 25 Basquiats.  This expert consensus is another compelling reason to reject Barzman's claim that J.F. and he painted all the paintings.

That leads me to mention a disturbing fact.  The Plea Agreement is signed by Barzman and the government.  Dkt. 24.  On page 10, it is claimed that the "Fraudulent Paintings" "include the following:".  Page 11 reproduces images of nine paintings.  Each is one of the 25 authentic Basquiats, and none are the 9 Oslo fakes. *What is going on here?*  This is still another compelling reason for an evidentiary hearing.

### A FLUNKING MATH GRADE

It is stupefying to see so many implausible assertions, outlandish exaggerations, self-evident inaccuracies, and internal inconsistencies in one Plea Agreement to a single count of lying to the FBI.  Let's look at one representative issue.  That is a glaring invention that doesn't add up—the math.

Between the Affidavit, Plea Agreement, and sentencing memoranda, Barzman and the government offer no fewer than *SIX different versions of the number of fakes that J.F. and the defendant manufactured*.  Let's take a look.

*Barzman sold "ten pieces" to Force, Quan, and Burn.  Exhibit 2 (Affidavit), para. 32(a).

*Barzman sold 20 paintings from Mumford's storage locker.  Exhibit 7 (Barzman Notarized Statement).

*Only nine paintings are depicted as fakes in the Plea Agreement.  Dkt 24 (Plea Agreement), p. 7.

*Barzman and J.F. Painted "20-30" fakes, *i.e.*, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, or 30 fakes.  *Id.*, p. 6.

*"Most of" the 25 paintings in the OMA exhibition are his fakes, *i.e.*, at least 13 but not 25 and thus only 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, or 25.  *Id.*, p. 9. (That leaves at least 12 Basquiat paintings in the OMA exhibition that are not his fakes.  If so, who painted them? Maybe it was Basquiat!)

*Barzman created "about two dozen paintings." Dkt 29 (Government Sentencing Memorandum), p. 1.[16]

Altogether, Barzman gives us so many non-duplicated choices of the number of his fakes.  One would think that Barzman would have attempted to do something in the Plea Agreement or his sentencing memorandum[17] to settle upon a number or reconcile the breathtaking contradictions concerning one of the most material issues in the case.  Of course, nothing in the Plea Agreement could cure the contradictory numbers set in stone in the Affidavit and Notarized Statement.  Barzman cannot unring the bell.

---

[16]As noted above, the number of actual known fakes is nine, but not the nine of our 25 authentic Basquiats cynically depicted in the Plea Agreement.  They are the 9 Oslo Fakes.  *See* Exhibit 9.
[17]Barzman's sentencing memorandum is curiously silent about the amount of his forgeries.

27

1    This is not nitpicking.  In a case dealing with supposedly fraudulent paintings,
2    it is certainly material how many the defendant created.  Barzman had plenty of time
3    between his confession in October 2022 and signing his Plea Agreement in March
4    2023 to examine the images, confer with J.F., and make an accurate determination.
5    The wild discrepancy speaks volumes about his fabrication of the entire Barzman
6    fakes provenance.

7    We are left with the regrettable but ineluctable conclusion that the Court,
8    public, and BVCG have been deceived in a most spectacular way.  The supposed Art
9    Crime of the Century is not the owners' fraudulent claim of provenance that the 25
10   Basquiats came from Mumford.  No, the crime here is a practiced deception that they
11   were painted by a scrounger of storage lockers and a night club doorman
12   moonlighting selling Christmas trees.  Did they really think that no one would be able
13   to expose this blatant attempt to destroy the 25 Basquiats?

14   My words are harsh. I do not use them lightly. It is the evidence— mostly the
15   words from Barzman's mouth—that compels this condemnation.[18]  I am fighting for a
16   chance—maybe my only one—to show the truth.

17   **THE MUMFORD BASQUIATS PROVENANCE IS AUTHENTIC**

18   I hope that I have demonstrated to the Court's satisfaction that the Barzman
19   Fakes provenance is false, and that his false statements under oath warrant an
20   evidentiary hearing to protect the victims of his fraud on the Court.  I now want to
21   summarize the substantial evidence establishing that the Mumford Basquiats
22   provenance— the 25 paintings were created by Basquiat, purchased by Mumford, and
23   stored away by him in his storage locker—is authentic. This evidence is independent
24   of the previously-discussed acknowledgments by Steakley and Barzman that the 25
25   Basquiats originated in Mumford's storage unit.

---

28   [18]There are other notable contradictions here.  We are told that Barzman and J.F. created the fakes,
and Barzman sold them.  How did he sell them?  Barzman says he sold them "out of the trunk of
their car" (Dkt 30, pp. 2, 7), while the government says that they were sold on ebay. (Dkt. 29, p. 2).

1    Preliminarily, I want to acknowledge the existence of a critique of the

2    proposition that 25 works by a famous artist, potentially worth tens of millions of

3    dollars if authentic, were found in a storage locker 30 years after they were

4    supposedly painted.  While lost authentic art has been found decades and even

5    centuries after their creation[19], a treasure trove of about two dozen would be indeed

6    unusual.[20]  So, I acknowledge at the outset the presumed questionability of the

7    Mumford Basquiats provenance.

8    But that is all it is—a presumption.  Presumptions of course are just the act of

9    believing something is true without having any proof.  In the law, presumptions must

10   be tested by evidence—the mother's milk of our legal system.  In adjudicating

11   disputes, facts reign supreme and overcome surmise, speculation, presumptions,

12   inferences, hearsay, hyperbole, and uninformed public opinion.

13   In his closing argument during his successful defense of the British soldiers in

14   the so-called Boston Massacre trial in 1770, John Adams famously told the jury:

15   "Facts are stubborn things; and whatever may be our wishes, our inclinations, or the

16   dictates of our passions, they cannot alter the state of facts or evidence."

17   Let's examine the facts supporting the validity of the Mumford Basquiats

18   provenance.

19

20

21

22

23   [19]Masterpieces by iconic artists such as Rembrandt, Klimt, Van Gogh, Carvaggio, and Tiepolo have
     been found in attics, basements, and behind walls, lost for upwards of 350 years.
     https://news.artnet.com/art-world/art-found-in-attics-ranked-1962993  In 2010, a trove of 271
24   previously unknown, authentic works by Picasso—worth hundreds of millions of dollars—was
     found in the possession of a retired French electrician and his wife.
25   https://abcnews.go.com/International/finding-lost-art-picasso-treasure-trove/story?id=12268538
     We can expect "to see more and more lost works of art turning up thanks to advances in technology
26   that can verify authenticity in a way that's never been possible before." *Id.*

27   [20]But it would not be unheard of.  *See https://www.whatsellsbest.com/news-
     stories/2018/08/storage.php* (Veteran New York gallery owner pays $15,000 for storage locker
28   contents containing what may be paintings by Willhem de Kooning and Paul Klee worth tens of
     millions of dollars.)

29

1.   **Basquiat Was Known To Sell Paintings for Cash Without His Dealers**

Basquiat was a prolific artist who produced thousands of works. *See, e.g,* https://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1815&context=masters-theses

As noted above, Basquiat frequently sold his paintings on his own "out the back door" for cash, thereby eliminating the middle players, namely his dealers. This resulted in many works being unaccounted for when his Catalogue Raisonné was prepared. Indeed, "all experts agree that there are real Basquiats in existence that were not authenticated by the Basquiat [Authentication] Committee or do not appear in current publications. Basquiat was a prolific artist whose chaotic life meant that he would distribute works outside his dealers." Exhibit 1 (Appraisal Report), p. 29.

A claim that numerous Basquiat paintings—previously uncatalogued or authenticated by the Committee, had been created at the same time, and sold by the artist for cash—is on its face not necessarily false or unlikely since, as we have seen, undocumented works by Basquiat have historic precedent. Moreover, this refutation of any sweeping generalization is also supported by the common-sense fact that a forger would produce at one time only one or two fakes on canvas (the preferred substrate for purchasers) and not 25 on cardboard and plywood. *See, e.g.*, https://www.austinartistsmarket.com/famous-fakes-art-history/

Eminent art critic Anthony Hayden-Guest, commenting on another large collection that he found to be authentic Basquiats, once told me that "surely no faker would produce such a remarkable quantity of fresh work. A pro will do two or three, perhaps come up with a convincing provenance. . . . No faker in his right mind will come up with a dozen [or more]."[21]

_____

[21]One of our nation's most distinguished art critics, Hayden-Guest has written several books and frequently contributed to major magazines such as the *Sunday*

Moreover, the circumstance of the discovery of these paintings—in a secure storage locker in a reputable storage facility and owned by a prominent Hollywood figure for decades—makes it more likely that they were not planted there by Barzman or recent fabrications.  Indeed, as demonstrated above, the actual improbability here is Barzman's fantastic tale riddled by so many glaring inconsistencies, implausibilities, and scientific impossibilities.

2.     **Mumford told six persons that the 25 Basquiats belonged to him.**

Over a five-year period between 2013 and 2017 toward the end of his life, Mumford told *no fewer than six persons* that he had befriended Basquiat in 1982, gave him a small amount of money ($5,000) for a lot of paintings on cardboard that he not like, put the paintings in a storage locker, never saw them again, and lost them when he became seriously delinquent in paying his storage fees.

(a)     **Lee Mangan and William Michael Force**

After the paintings were purchased from Barzman, Lee Mangan and William Michael Force sought to meet with Mumford.  With the assistance of his longtime lawyer Judith Karfiol, an introduction was made.  Mangan and Force met twice with Mumford in early 2013 at Canter's Deli in the Fairfax District of Los Angeles.

At the meetings, Mumford told them that he got to know "Jean" (as he called him) in 1982 while the artist was painting in Venice, California and Mumford was working on the final episode of *M*A*S*H*.  Basquiat needed money, so Mumford paid $5,000 for a bunch of paintings on cardboard.  Mumford did not like them; rather than display them, he put them in his storage locker.  These were his Basquiat

---

*Telegraph, Vanity Fair, The New Yorker, Paris Review, Sunday Times, Esquire, GQ (UK), The Observer, Radar,* and *Rolling Stone*.  Author of a highly-praised *Vanity Fair* article on Basquiat while he was alive, Hayden-Guest knew Basquiat, watched him paint at his studio, and studied his works.

1  paintings that had been purchased out of his locker because he fell behind for several

2  years in paying his storage fees.  *See* Exhibit 12 (Declaration of Leo Mangan)

3    Contemporaneous evidence substantiates that Mangan and Force are telling the

4  truth that they met with Mumford.

5    First, emails from his longtime attorney Judith Karfiol show she is arranging

6  for a phone call between Mangan and Mumford.  *See* Exhibit 13 (Judith Karfiol

7  emails).

8    Second, Mangan states that when he met with Mumford, he asked him for the

9  record showing that he had a storage locker from which his paintings were taken and

10  sold. Mangan could not obtain a copy of this private business document without

11  Mumford's consent.  Mumford said that he would contact the storage company, and

12  he did.

13    In one of the most significant documents in this case, Renee Ortiz, the

14  accountant at Ortiz Bros. Moving & Storage where Mumford stored his paintings,

15  sends an email to Mangan confirming that Mumford had asked her to send the

16  attached document which is the dunning notice sent to Mumford in April 2012.  *See*

17  Exhibit 14 (dunning notice).

18    Ortiz says:

19

20    "Lee,

  **Per Thad Mumford's request**, I'm sending you his auction notice and
21  statement of account. This was sent to him via certified mail advising
him of the auction. Other lots were sold that day, however storage
22  accounts were not commingled and were sold separately. Please let me
know if you have any questions. Thank you."

23  Exhibit 15 (Email from Renee Ortiz to Lee Mangan, dated January 30, 2013)

24  (emphasis added)

25    This stunning piece of evidence alone removes any doubt that Mangan and

26  Force developed a relationship with Mumford in early 2013 just as they state.

27

28

(b)   **Taryn Burns**

On February 13, 2103, Mumford left two voice messages on Taryn Burns' answering machine in response to her call to him.  Mumford confirmed that the paintings that came from his storage locker had been purchased by him from Basquiat when he was working on *M\*A\*S\*H*.  *See* Dr. Saggese Report, Appendix B (Declaration of Taryn Burns) ([www.bvcg.org](www.bvcg.org))

Mumford also had telephone calls in mid-2017 with two highly credible persons independent of this case.  Both have signed declarations about their interaction with Mumford.  These calls further confirm the authenticity of the Mumford Basquiats provenance.

(c)   **Talin Maltepe**

The first call was with Talin Maltepe who is a Toronto resident and principal owner of an art advisory firm.  Maltepe has an M.F.A. from York University, and her Master's thesis was on Basquiat.  For many years, she has dealt with uncatalogued works attributed to Basquiat and others.

Before she agreed to help the owner market his Basquiat paintings, Maltepe examined the originals, and they appeared to her to be authentic works by the hand of Basquiat.  She got Mumford's phone number and called him.  Here is what she says about her conversation with Mumford.

> "I spoke to Mr. Mumford by telephone in or around the Spring of 2017. Mr. Mumford told me that he had met Basquiat in 1982, in Los Angeles. They attended parties and night clubs together, and the two bonded because of their status as successful Black artists. Mumford commissioned a painting from Basquiat for $5,000 and paid in cash. Mumford told me that, in those days, $5,000 was little to him and he was happy to help his friend raise money. Mumford had expected to receive a single large canvas.  *Instead, Basquiat delivered a whole bunch of works on cardboard.* Mumford said that he did not care for the paintings and did not want to frame or display them in his home.  On the other hand, he did not want to offend his friend, so he accepted the paintings graciously and *then decided to store them*. He sounded upset that he lost those paintings and that really convinced me that the paintings were authentic since he had nothing to gain."

Exhibit 16 (Declaration of Talin Maltepe (February 25, 2022), Para. 7) (emphasis

33

1   added)[22]

2           (d)   **Ed Celis**

3           The second Mumford call was with Eduardo Celis Rojo who calls himself Ed

4   Celis.  He is a respected entrepreneur, producer, and documentarian whose company

5   is located in Santa Monica.  While he was working on a documentary *Bill of Sale*

6   about previously unknown works by various artists, including Basquiat, he met Talin

7   Maltepe.  In early summer of 2017, Maltepe told him about the Basquiats and

8   Mumford.

9           Celis found this information relevant to his documentary.

10

11          "I was interested in the human aspect of the story: how Mr. Mumford
            had lost access to a storage space in Los Angeles that contained some of
            his most cherished possessions including a historical Emmy award,
12          baseball memorabilia, and the paintings by Basquiat."

13  Exhibit 17 (Celis Declaration (April 11, 2022), para. 5)

14          Celis was eventually able to reach and speak with Mumford about Basquiat and

15  the paintings that Mumford bought from him.

16          "I tried multiple times to contact Mr. Mumford unsuccessfully, but when
            I finally got a hold of him, he explained that he had not been feeling well
17          for some time. Our conversation was brief and friendly.  Mumford
            sounded tired, frail, older than I expected, but eloquent and bright. He
18          was generous with his time, given that we had never met and his
            condition.

19
            "We spoke about his work and life experience, which paralleled my
20          father's, who also came to California to work in the entertainment
            industry after growing up in New York.  They were both Yankee fans,
21          and Mr. Mumford had been a batboy for them in his youth.  He enjoyed
            talking about the Yankees and his work in Hollywood—the memories
22          brightened him up."

23  *Id.*, paras. 6 & 7.

24          Celis directed the conversation to Basquiat and his paintings.

25          "At that point, the conversation shifted to the story that had been related
            to Talin by her clients: How he lost access to a storage unit in Los
26          Angeles where he had stored his most valuable memories (particularly

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28  [22]Based on her academic background in Basquiat and years as an art advisor working with the
    artist's works, Maltepe believed that the paintings "are authentic works made by the hand of Jean-
    Michel Basquiat [and] that they are some of his finest works . . . ." *Id.,* para. 11.

                                            34

his Hollywood and Yankees memorabilia) and the Basquiat paintings and 'other stuff.'

"He did not say much about the paintings other than to describe them as `they're on cardboard - and not pretty. Not my favorite.  It was just sad, losing those things for an unpaid bill.'

"When I tried to ask him about his time with Basquiat in Los Angeles in 1982, he responded that he was willing to be interviewed and talk to me about the paintings and Basquiat `I could talk about Jean, yeh, we can talk about that. We spent some good times together.'"

*Id.*, paras. 9-11.

Celis is clear about what Mumford told him during that phone conversation.

"When I spoke with Mr. Mumford, he confirmed that he had lost a rental storage unit containing some of his most dear mementos and possessions of great sentimental value, including photographs, baseball memorabilia, his Emmy, and some cardboard paintings by Basquiat. He stated that he had known Basquiat and was willing to talk to me about his time with him."

*Id.*, para. 14.

        (e)   **Adriana Trigiani**

As discussed below, in late 2015 or early 2016, Mumford also told a former colleague (Adriana Trigiani) that had purchased numerous paintings from Basquiat. *See* Exhibit 5.

These accounts of conversations with Mumford by five persons are consistent with each other and consistent with Burns' report about his two voice messages.[23] The vast weight of credible evidence substantiates the validity Mumford Basquiats provenance.[24]

---

[23]It is striking that these witnesses have not talked with each other about their statements.  In fact, Maltepe and Celis do not know Burns, and Mangan has no prior contacts with Celis.

[24] According to the Affidavit, Mumford twice told law enforcement— in 2014 and 2017—that he denied buying any paintings from Basquiat and there were never any such paintings in his storage unit.  *See* Exhibit 2, paras 13 & 14.  As we have seen, however, Mumford volunteered just the opposite to five persons in 2013 and 2017.  There are understandable reasons why Mumford would not be telling the truth to law enforcement which can be discussed if necessary at a later time.  At a minimum, there was substantial evidence justifying the Basquiats' owners to believe in good faith, and make representations about, the Mumford Basquiats provenance. We never made any knowingly false claims about the origins of the paintings, and as it turns out, we were right.

     3.    **Mumford and Basquiat collaborated on an autobiographical Poem.**

As discussed below, I obtained a Poem that was reportedly the joint effort of Basquiat and Mumford in 1982, appeared to confirm a close bond between the two, and mentioned numerous common aspects of their lives and paintings. If this document was legitimate, it provided in my mind another independent, indeed conclusive, verification of the Mumford Basquiats provenance that could be sourced to Basquiat himself. I set out to determine the Poem's authenticity.

When I met for the first time with Lee Mangan in early 2018, he gave me a copy of a typed poem that he said was given to him by Mumford via an intermediary in late 2015 or early 2016 ("Poem"). *See* Exhibit 18. The Poem is initialed "**JMB**." Mangan called it metaphorically "the receipt" for the paintings.

The Poem is 21 lines of free verse with numerous striking autobiographical references that are common to both Basquiat and Mumford in terms of their lives as creative persons, Black men in a Caucasian world, and Brooklyn roots. There is even a reference to "*25 paintings.*" Here is a legible version of the Poem:

*"The start of a new day*
*No longer outsiders*

*Industry insiders golden crowns receiving*
*Brooklyn brothers hands creating*
*Drawing writing bridging gaps*
*LA summer bright*
*Beware the fleeing wretched loneliness*
*25 paintings bringing riches*
*Sing along Dr. Thad sing along*
*Breaking bread this our summer*
*Wrapping close last scene of war*
*Eat drink celebrate*
*Choices made intriguing*
*A serious quest we undertake*
*Raw emotions of a child*
*Did you know*
*We film, we write, we film, we paint*
*Crowning glory brings cheers and statues*
*Oh how grand we feel*
*Oh how lovely our life will be*
*A baseball a bird a television our play a future brigh(t)"*

36

*The reference to "Sing along Dr. Thad sing along" is a tell-tale clue that the Poem is clearly referring to Mumford.  Not only did he go by the name "Thad," he created (and was the voice for) a popular character "Dr. Thad" for *Sesame Street* who appeared in the recurring skit "Dr. Thad and The Medications." (http://www.behindthevoiceactors.com/tv-shows/Sesame-Street/Dr-Thad/ ) (https://en.wikipedia.org/wiki/Thad_Mumford) Basquiat was an avid tv viewer as a young boy and teenager.  "Sing along Dr. Thad sing along" is an homage to Mumford as a friend and creative talent. http://muppet.wikia.com/wiki/Dr._Thad_and_the_Medications?file=Thad%26Medications.jpg

*The artist and writer developed a close, albeit apparently brief, relationship. This was "LA summer bright" while the two new friends were "breaking bread" and liked to "[e]at drink celebrate." Basquiat was a known partyer, playboy, and drug user. https://www.nytimes.com/1988/08/27/arts/jean-michel-basquiat-hazards-of-sudden-success-and-fame.html; https://www.theguardian.com/artanddesign/2017/sep/03/jean-michel-basquiat-retrospective-barbican

*Basquiat and Mumford shared common geographical roots—they were "Brooklyn brothers . . . ."  Basquiat was born in Brooklyn Hospital and frequented the Brooklyn Museum as a youth.  Mumford also grew up in Brooklyn and was the first African-American batboy for the New York Yankees.

*They are artistic brothers ("hands creating"):  Basquiat "[d]rawing" and Mumford "writing."  "We film, we write, we film, we paint . . . ."

*The two soul brothers are also artistic pioneers among African-Americans who are "bridging gaps" between the races.  Basquiat's career as a painter—in an almost completely Caucasian art world—was taking off, while Mumford had long ago established himself as a stellar television writer/producer for such cross-over hit shows as *Cosby, Maude, Roots:  The Next Generation, Sesame Street*, and *M\*A\*S\*H*.

They were "[n]o longer outsiders" but instead "[i]ndustry insiders golden crowns receiving."

 *The reference to "golden crowns" alludes to Basquiat's frequent use of a three-pointed crown as his signature on his paintings, including several in the 25 Basquiats.  Basquiat also depicted power figures/aristocracy wearing crowns.

 *By referencing "[r]aw emotions of a child," "[c]hoices made intriguing," and "[a] serious quest we undertake," Basquiat was likely referring to his welcomed escape to Los Angeles in 1982 and his coveted break from the pressures of painting large canvases for New York and European exhibitions.  This escape afforded him the opportunity for freedom to experiment with style, substrates, size, themes, symbols, and colors—all of which are reflected in the 25 Basquiats. By all accounts, 1982 marked the zenith of his artistic genius.  For example, as noted, Basquiat's *Untitled*—sold at auction for record price of $110.5 million in May 2017—was painted in 1982.

 *This was a time before Basquiat completely soured on the stultifying commercial art scene of New York-based art dealers (whom he fired and circumvented with regularity).  Here Basquiat expresses passionate optimism, indeed exhilaration, about his art: "Oh how grand we feel/Oh how lovely our life will be . . . a future bright."

 *In the last line, the Poem mentions three images that appear in one of the 25 Basquiats:  "[a] baseball a bird a television. . . ."

 In an essay "BROTHERS IN BOND THADDEUS Q.  MUMFORD, JR AND JEAN-MICHEL BASQUIAT: A LIFE AND LEGACY IN 25 PAINTINGS," the OMA catalogue *Heroes & Monsters* (pp. 42-48) contains an in-depth analysis of the Poem, the rich autobiographical references, and this work's significance in authenticating the paintings. (www.bvcg.org)

If authentic, the Poem is a remarkable memento of two strangers bonding for at least a while and singing in verse their shared interests and aspirations—and leaving no reasonable doubt that Mumford acquired paintings from Basquiat.  But was the Poem genuine?  The first thing that I sought was an expert opinion on the **JMB** handwriting on the Poem.

I engaged James Blanco to examine the Poem.  *One of the nation's foremost document examiners, Blanco has rendered over 8,000 expert reports and testified as an expert in hundreds of federal and state cases.  A former forensic document examiner for the U.S. and California Departments of Justice, Blanco has analyzed the paintings of numerous artists, including Picasso, Cezanne, Rembrandt, Pollock, Degas, Matisse, de Kooning, Basquiat, Dali, and many others.*

On May 5, 2018, I received a report from Blanco analyzing the **JMB** initials on the Poem.  www.bvcg.org   Blanco concluded that based on a comparison to Basquiat's known handwriting, Basquiat wrote the initials on the Poem.

> "Due to the numerous similarities in handwriting features, Jean-Michel Basquiat is identified as the author of the "JMB" handwritten initials appearing on the poem."

*Id.*, p. 4.[24]

Significantly, in some classic detective work, Blanco also determined that the typewriter used was of the period when the Poem was believed to be created in 1982.

> "The mechanical printing on the poem, that is the typewriting, was examined to see if there was any evidence to help determine a time period in which the poem was created. Although a copy of the poem was provided for analysis, evidence did emerge to determine rough dating parameters for the creation of the poem. That is, *it was not printed on any modern printer because the typed alpha-characters are consistent with impact typewriters from the 1982 time period when the poem was thought to have be created*. . . .

---

[24]In the lexicon of document examination, "identified" has a special meaning. "Identified" is a term of art in the field that "represents the highest degree of confidence expressed by document examiners in handwriting comparisons. That is, *the examiner has no reservations whatsoever,* and the examiner is certain, based on evidence contained in the questioned materials, that the writer of the known material actually wrote the handwritten works in question . . . ." Blanco Report, p. 4 (emphasis added). www.bvcg.org

"Examination of the typewriting of the poem revealed a typing correction over the same character, the lower dipping of some characters below the base-line and other character malalignments, all consistent with impact typewriters from the 1982 time period when the poem was thought to have been created. *The presence of these typing defects demonstrate that the poem under review was not created by modern technology after the 1982 time period* such as daisy wheel typewriters, dot matrix printers, laser (xerographic) printers, ink-jet printers or thermal process printers. *The observed evidence tells us that the poem was not typed using computer software since an impact typewriter was used*."

*Id.*, p. 6 (emphasis added).

Later, in April 2022, I engaged another experienced forensic document examiner, Kurt Kuhn, to perform a peer review of Blanco's report on the **JMB** initials on the Poem. On April 21, 2022, Kuhn reported his agreement with both Blanco's methodology and conclusion that Basquiat wrote the **JMB** initials.

"Based on my personal review of the exhibits contained within Mr. Blanco's [May 5, 2018] report and his observations and findings, I concur with his observations and findings regarding authorship of the initials on the untitled, `Poem'."

www.bvcg.org

Based on the Poem's contents, verification that **JMB** was written by Basquiat, and the typewriter's vintage as 1982ish, I was convinced that the Poem was authentic. The one unanswered question, however, was how Mangan came to possess the Poem. Mangan told me that an associate Torrie Geisler had obtained it from a college friend who had worked with Mumford as a tv writer and got it directly from Mumford. Her name was Adriana Trigiani.

Trgiani is a major literary figure. After working in Hollywood on several television series, including *A Different World* with Mumford (1989-90), Trigiani struck out on her own. She has become a popular *New York Times* bestselling author who has written 18 bestsellers in fiction and nonfiction. Trigiani has also excelled as a playwright, television producer, and film screenwriter/director/producer.

https://en.wikipedia.org/wiki/Adriana_Trigiani

My efforts to contact Trigiani were unsuccessful until I learned that she would be doing a book signing at a northern New Jersey bookstore. Mangan and his wife

40

Michelle attended the event, introduced themselves, and asked if Trigiani recalled

helping her friend Geisler obtain the Poem from Mumford.  Trigiani responded that

she did indeed remember this incident and agreed to sign a statement to this effect.

*See* Exhibit 12 (Declaration of Lee Manan)

Trigiani has signed a statement, dated April 2, 2023.  *See* Exhibit 5.  In

pertinent part, she states:

> "While I was in college, I met Torrie Geisler who was a native of Indiana.  Torrie and I became very close friends.
>
> "Thad [Mumford] was an avid art collector.
>
> "Sometime in late 2015 or early 2016, Torrie contacted me to ask a favor.  She said that she knew that I had worked with Thad, was working on a project involving his Basquiat paintings, and needed some information about his collection.  Specifically, she wanted any documentation that he had a relationship with Basquiat and had purchased the paintings from him.
>
> "I was able to contact Thad and told him what I needed.  Thad came back to me with a document that he called 'a poem written by Jean and me.'  A copy of the poem is attached.
>
> "Once I received the poem, I gave it to Torrie."

*Id.*

The Trigiani statement ices the Poem's authenticity.  As Mangan aptly

observed, the Poem is the functional equivalent of Basquiat's receipt for Mumford's

payment for the 25 paintings.  In a larger sense, however, it is much more—the Poem

stands as an eloquent testimonial to artistic friendship.  And for Michael Barzman,

the Poem is a deafening rebuke to his tawdry tale of art fraud.

## A COLLECTION OF SIX EXPERTS HAS FOUND THE 25 PAINTINGS AUTHENTIC

I hope that the foregoing evidence has been sufficient to demonstrate that the

Barzman Fakes provenance for the 25 paintings is utterly false and that as victims of

his false statements under oath, we are entitled to a hearing to present this evidence.  I

also want to present the Court with some additional information further proving that

the Barzman Fakes provenance is fake *because the 25 Basquiat paintings are in fact*

41

1   *authentic*.  Over the past six years, an impressive array of six experts (plus the OMA

2   curators) from diverse backgrounds have opined that the 25 Basquiats are authentic,

3   *i.e.*, created by his hands and thus attributable to him.[25]  I will briefly summarize each

4   opinion.

5       1.    **Diego Cortez (1946-2021)**

6       Basquiat was a street artist in New York when he was discovered by Diego

7   Cortez.  A mid-thirties, *avant-garde* art curator and filmmaker, Cortez took the 20-

8   year-old artist off the streets and gave him some art supplies to paint in a studio.  In

9   his career, Cortez curated over 100 exhibitions, including the influential 1981 post-

10  punk art show *New York/New Wave* at MoMA PS1 at which Cortez arranged for

11  Basquiat to exhibit.  This exhibition debuted Basquiat and launched his dazzling

12  career.

13      From there, Basquiat's fame spread like a prairie fire with collectors flocking

14  to a succession of exhibitions in 1981 and 1982 in Modena, Italy, New York, Los

15  Angeles, Zurich, Rome, Rotterdam, and Kassel, Germany.  Basquiat's first agent,

16  Cortez was responsible for selling his works and then introducing him to most of his

17  subsequent dealers.  Cortez remained in Basquiat's life until he died in 1988.

18      When Basquiat died, his father Gerard formed the Basquiat Estate

19  Authentication Committee.  Cortez was co-chair and considered the most

20  knowledgeable among the committee members.  After reviewing about 2,000 works,

21

22  _____

23  [25]"Authentic," "authenticate," and "authentication" are terms in the art world that historically have
    meant that an artist's estate—via an official catalogue raisonné or authentication committee—has
    determined that the work was created by the artist and thus is his/her work, *i.e.*, it is authentic.  In
24  our case, the 25 Basquiat paintings were in storage from 1982 through 2012, and they were thus not
    known to exist for inclusion in Basquiat's catalogue raisonné (last published in 2010) or not
25  available for review by the Basquiat Estate Authentication Committee (disbanded in 2012).
    Nonetheless, the art world recognizes surrogates for these two authentication sources—typically,
26  experts with academic and real-world experience, knowledge, and familiarity with an artist that
    entitles them to render an opinion on whether a particular work was created by the artist and
27  therefore attributable to him.  Some experts use the terms "authentic," "authenticate," and
    "authentication," while others use "attributed" or "attributable."  In the end, however, it means the
28  same thing—in the expert's opinion, the referenced artist created the work.

the Committee disbanded in 2012.  From all that I read and was told by experienced people in the modern art world, there was no more qualified expert than Cortez with the credentials and experience to authenticate Mumford's paintings.

On March 1, 2019, Cortez personally examined our six BVCG Basquiats at their New York storage location.  Thereafter, he gave me his signed Statement of Authenticity which states in part:

> "It is my opinion that the six works are all authentic works by Jean-Michel Basquiat . . . . The signatures on the paintings all seem correct.

> ". . . I am a knowledgeable expert on Basquiat's work, especially his early work from 1980-1982. . . .

> "Strong graphic work with a central iconic figure, which is represented in these works, is an excellent example of Basquiat's work from that period.

> "I feel the key to Basquiat's work is his [drawing] properties—his intensity of line.  I personally prefer work done by him from early 1981 through early 1983. . . .

> "These works capture that power which has subsequently engaged so many collectors and museums around the world."

www.bvcg.org [26]

2.   **James Blanco**

I engaged the renowned forensic document and art examiner to analyze our six paintings.  James Blanco performed a detailed comparison of our paintings and known Basquiat paintings in the Catalogue Raisonné and *The Notebooks* of Basquiat. Blanco concluded that all six works were created by Basquiat.

> "Numerous distinctive similarities were observed in the comparisons of the hand printings, monograms, symbols, markings, sketches and doodles observed in each of the six Catalogue items referenced herein when compared to the known works by Jean-Michel Basquiat as presented in the Catalogue Raisonné and in *The Notebooks*.  Due to these similarities, Jean-Michel Basquiat *is identified* as the person who created each of the [six paintings] presented in this report. That is to say, *Jean Michel Basquiat authored each of the [six paintings]*."

www.bvcg.org (emphasis added)

---

[26]Cortez also separately examined and issued a Statement of Authenticity for the other 19 Basquiats.

1      Significantly, on our six paintings, Blanco finds Basquiat's signature on 4

2  pieces, his distinctive three-pointed crown on 5 works, and both on 2 paintings. *Id.*

3       3.   **Dr. Jordana Moore Saggese**

4      I was fortunate to be able to engage Dr. Jordana Moore Saggese to examine the

5  paintings.  A foremost authority with impressive credentials, she was the leading

6  academic scholar on Basquiats' body of work.  Dr. Saggese has published two

7  acclaimed books and lectured widely about the artist.  At the time an Associate

8  Professor at California College of the Arts in San Francisco, she was awed by the six

9  works when she saw them for the first time on July 18, 2017.  She told me:

10

11      "These are marvelous works in excellent condition that have many of the
       distinctive elements of Basquiat's best paintings.  A lot of his early
12     works were opportunistic of what materials were available.  Cardboard is
       not out of the realm of possibility."
13    Dr. Saggese then gave an analysis of each painting which she unequivocally

14  attributed to Basquiat.

15      *One More King/Czar*: "looks very good;" "an early work with familiar
       markers;" "crown resembles first crowns;" "feathers are a common
16     theme;" "the writing and repetition of 'a' are very common."

17      *He Didn't*: "this painting has commonality seen in similar works,
       including the arms come around and are extended;" "the general shape
18     of the aura and crown are commonly seen elements;" "there are many
       more common motifs such as a lot of doodling, references to music,
19     anatomy of the lungs and heart, and others."

20      *Boxer*: "This is a very beautiful one;" "the use of multiple 's's" is seen in
       similar works such as *Net Weight* in 1981;" "the eyes, nose, and head are
21     typical and very popular in Basquiat's works;" "the copyright symbol ©
       lived past the days of SAMO, identifying his ownership in his own
22     career."

23      *Self-portrait with his cowboy hat wearing Leonardo da Vinci's flying
       suit*: "This is the most exciting of the whole works, a very strong piece;"
24     "many elements are common, including the cowboy figure, the ghost,
       skyscrapers and cityscapes, painting over things, several layers of
25     underpainting, and the signature spelling out his full name."

26      *Colorful Face or Skull*: "This is very exciting. The piece is not as similar
       as the other works. The shape of the head, the roundness, the teeth, two
27     different shapes of the eyes is not seen often."

28      *Reptile With Claws and a Crown*: The front of the unique two-sided
       painting: "This reptile with a crown is strikingly comparable to a known

44

work. The upraised arms are common elements, revealing the arm and the joint. Very interesting. This has hints of reptilian with comparison of works of dinosaurs. The almost cartoonish reference to 'BAT BAT, BAT' has an element of monster humor. There are multiple outlines which is commonly seen in Basquiat's works. There are a lot of nuances.  This has a deeper meaning. There is nothing indicative of a rush job."

The verso (*Mystery Creature/Bat*): "The interesting head is similar to later works.  This is a fantastic work in striking superb condition."

Dr. Saggese then conducted several months of extensive research, culminating in a thorough, scholarly 73-page report issued on November 30, 2017.  Her analysis is a masterful study of Basquiat's life, themes, historical significance, and stated the reasons why she unequivocally concluded that each of our six paintings were "*consistent with the hand of Jean-Michel Basquiat and may be attributed to him*." Dr. Saggese Report, pages 47, 52-53, 55-56, 61, 66, 71, 73 (emphasis added) (www.bvcg.org)

Dr. Saggese explained her thinking:

"*[I]t is my professional opinion that [these six paintings] may be attributed to Jean-Michel Basquiat based on their comparison to known works, with which these paintings share imagery and icons*.  The paintings contain many of the most popular symbols of Jean-Michel Basquiat, including: crowns, figures with halos, arrows, figures with top hats, skulls, and bird-like figures. We also see several examples of cars and trucks, which held a personal significance for the artist given his childhood experience of being hit by a car.  The constellation of images that appear on the surfaces operate outside of a specific narrative; it seems instead that the works have been radically distilled to include only the most salient symbols, as if an attempt is made here to represent the artist only via specific reference to his best-known works. Here, the symbols themselves become a type of currency, a recognition of the artist's marketability and significance on a global scale."

*Id.*, pages 42-43 (emphasis added)

These three expert opinions—by Cortez, Blanco, and Dr. Saggese—had been received by the time in spring of 2021 when the OMA decided to mount an exhibition of the 25 paintings in 2022.

4.  **Dr. Aaron De Groft**

The decision to exhibit our paintings was made by the OMA Director and Chief Executive Officer Dr. Aaron De Groft and his curatorial staff, led by Hanson

1  Mulford.  At his retirement, Mulford was Senior Curator of the Collections and

2  Exhibitions Department, having served in various capacities at OMA since 1981.

3  https://www.orlandoarchitecture.org/artshowjudges

4      For over 35 years, Dr. De Groft, an art historian with three degrees, has been a

5  museum director, author, and art curator.  He was the former director for

6  the Muscarelle Museum of Art at the College of William and Mary before he joined

7  OMA in 2021. https://en.wikipedia.org/wiki/Aaron_De_Groft[27]

8      In the spring of 2021, as part of his due diligence, Dr. De Groft and a curatorial

9  staff member traveled to New York to view the 25 Basquiats.  After his examination,

10 he emailed me:

12  "These are *astounding masterpieces* in one of the last times Basquiat
    was painting for himself. After the year 1982, Basquiat was always
13  painting for someone else. *The exceptional quality and depth of these
    raw-energy cardboard and plywood works from the Mumford Collection
14  are the purist form of Basquiat, much like when he was painting in and
    painting on...Brooklyn.* We made a discovery never mentioned or
15  observed and recorded before by anyone. Basquiat used spray painting
    on these cardboards from the Mumford Collection, thus tying these
16  California pictures directly to Brooklyn. . . . I will say once again that
    these works in the Mumford Collection are masterpieces and, as of yet,
17  there are no comparable works like this now, or before them. *I would say
    they are singularly unique*. Let me know how I can help to debut these
18  masterpieces to the world."

    Emphasis added.
19      5.    **The OMA Catalogue Expert Opinions**

20      OMA produced a marvelous 166-page catalogue with very high-quality

21  artwork. The digital catalogue can be found on our BVCG website:

22  https://www.bvcg.org/oam-cat.  The catalogue is a significant collection of serious

23  scholarly articles about Basquiat and the 25 paintings.  Four of the authors and the

24  OMA curatorial team unequivocally endorsed the validity of the collection.

25

26

27  [27]After publicly defending Dr. De Groft's decision to mount the *Heroes & Monsters* exhibition,
    OMA abruptly terminated him following the paintings' seizure by the FBI.  Dr. De Groft continues
28  to vigorously champion the paintings' authenticity and exceptional quality.  *See* Exhibit 11, para. 6
    (Declaration of Aaron De Groft)

(i)     Dr. Aaron De Groft

In his Introduction (p. 20), Dr. De Groft praised the works as quintessential Basquiat.

> "The fact that *these masterpieces* even exist untouched for thirty years is a marvelous miracle for all of us. That they are *fresh and vivid*—having been fortuitously locked away and perfectly preserved for thirty years—makes the opportunity to see them for the first time a once-in-a-lifetime experience. The exceptional quality and depth of these raw energy cardboard and plywood works from the Mumford Collection are *the purest form of Basquiat* much like when he was in and painting on New York. The works are exuberant Basquiats, and they exude power and energy long before the battery went dry. *They are destined to be ranked among his very best works.*"

https://www.bvcg.org/oam-cat (emphasis added)

(ii)    Michael Klein

Michael Klein, the veteran art curator, gallerist, and author, saw Basquiat paint in 1982 and has been familiar with the paintings since around 2015. He has seen all 25 paintings.

In his article for the OMA catalogue entitled *The Mumford Collection: An Encyclopedia of Basquiat* (pp. 91-95), Klein calls them "marvelous works," "savagely autobiographical," and possibly "a kind of encyclopedia of Basquiat at age twenty-two."

> "Large or small, there is an attention to detail and to a well-crafted surface in all the works in the collection. Basquiat was determined to always include something of himself, whether it is the stick figure-like form that stands with an arrow in hand that surely is a self-portrait or the image of a crown or the cluster of birds that, like pigeons, seem to be everywhere and is a reminder no doubt of home in New York City."

> ". . . [Basquiat's] great success in LA and the works he produced for Mumford all are now part of a larger repertoire of highly sought after art produced by a young artist with great drive, intensity and a vision of himself as both hero and victim in late 20th century America. What this collection of twenty-five works represents is a model of a world lived by an artist, a bright shooting star that appeared, gave light and quickly dimmed. Left behind is his message—in color and on numerous fragments of cardboard—for all to now enjoy."

https://www.bvcg.org/oam-cat

1

(iii)   James Blanco

2   James Blanco authored an insightful article entitled *Basquiat's Universe As*

3   *Expressed In The Basquiat Venice Collection*.  In 15 pages replete with keen analysis

4   and comparisons of the 25 paintings to those in the Catalogue Raisonné and other

5   collections, Blanco takes the reader on a highly informative, compelling journey to

6   significant themes, images, and expressions in Basquiat's world.

7   Blanco covers three-pointed crowns and coronation of heroes, baseball,

8   childhood allusions, cowboys and Native Americans, monsters and science fiction,

9   thrillers, influence of Picasso, pine trees, youthful memories and inspiration for his

10   paintings.

11

12   "With these foregoing notable similarities, it is beyond dispute that *these authentic Collection paintings from 1982 mirror and are integral elements of Basquiat's universe*. Indeed, some are better conceived,

13   drawn, colored and executed than works in the Catalogue Raisonné.  The Collection is a significant discovery for the art world that advances our

14   knowledge, and deepens our appreciation, of Basquiat's singular genius."

15   https://www.bvcg.org/oam-cat (emphasis added)

16

(iv)   Stevenson Dunn

17   Stevenson Dunn also authored an article for the catalogue entitled *Basquiat*

18   *Transcendent Reimagining America's Most Influential Artist* (pp. 89-96).  Dunn is a

19   co-founder and co-owner of The Bishop Gallery in Brooklyn. In addition to curating

20   hundreds of art shows with emerging and established artists on six continents,  Dunn

21   has co-curated seven solo Basquiat exhibitions in New York City, Miami, and

22   Switzerland.  Dunn has spoken at Harvard University, U.S. Naval Academy, and

23   other universities.

24

25   "This *extraordinary collection* of 25 paintings by Basquiat from 1982 is a positive step in the direction of making Basquiat accessible to his multi-variegated constituencies.  *This unique collection* offers us the

26   unprecedented opportunity to see Basquiat as Basquiat, at ease painting for himself and not affluent collectors or gallery owners.  This is both

27   artist and canvas unleashed as we see in so many delightful ways how Basquiat was free to express his singular style and voice his thoughts

28   and feelings about a host of issues ranging from his blackness to his demons."

48

https://www.bvcg.org/oam-cat (emphasis added)

(v)     OMA Curatorial Staff

The Catalogue also contained 25 entries for each of the paintings written by Dr. De Groft and his curatorial staff (including Hanson Mulford).  From pages 98 to 151, they meticulously drew scores of probative comparisons between paintings in the Mumford Collection and Basquiat's known body of work. https://www.bvcg.org/oam-cat  In some of the paintings, their scholarship discovers aspects of common elements in Basquiat's works such as the use of Hobo Code.  A Sotheby's write up on a Basquiat for sale highlights the importance of this finding in the 25 Basquiats.

> "In *Untitled*, Basquiat recalls his street art past by incorporating a series of symbols he came across in Henry Dreyfuss's *Symbol Sourcebook*, especially the "hobo signs" which travelling vagabonds would use to denote certain areas as safe or treacherous along the road. Many of the repeated sketches in the present work are copied from the 'hobo signs': the cat symbolizes that there is a kind lady in residence, while the large circles warn that there is "nothing to be gained here." Several of these signs appear throughout his artistic practice, repeated like incantations in his drawings and larger paintings. This language of wanderers is blended with other references to chemistry, anatomy and engineering, juxtaposing street smarts with academic thought, and providing insight into Basquiat's artistic process and interests."

https://www.sothebys.com/en/auctions/ecatalogue/2018/contemporary-art-day-auction-n09859/lot.182.html

### THE 25 BASQUIATS ARE DEMONSTRABLY AUTHENTIC

By the time Barzman lied in the Affidavit and enabled the FBI to obtain a warrant to seize the 25 paintings, no fewer than six experts (plus the OMA curators) had expressed their written opinions that the 25 paintings were created by Basquiat, and several of them were among his finest works.  Their conclusions were unconditional and explained without a hint that any were forgeries.

This consensual validation of the 25 paintings is powerful, additional evidence that Barzman is not telling the truth. What no known expert opinion about all 25

1 paintings furnished by the government, expressed in a written analysis, exists to
2 counter this compelling proof ?  None.

3      In the Affidavit, FBI Agent Rivas recounts that "I have spoken with experts
4 familiar with the works of Basquiat.  All of these people have told me that in their
5 opinion the works supposedly by Basquiat within the Mumford Collection are not
6 authentic."  Exhibit 2, para. 35.  None of these individuals is identified, and no
7 written opinions are mentioned.  Two persons—John Cheim and Annina Nosei—
8 stated that they were not authentic Basquiats, but they saw only images of all 25
9 paintings exhibited at OMA and not the originals, and they gave no reasons for their
10 conclusory opinions.  *Id.*, paras. 36 (b) & 36 (a), (b). That is all the FBI had when
11 applying for the warrant.

12      That there is opposing expert opinion hardly makes the 25 Basquiats fakes.  If
13 one thing epitomizes the high-end, fine art world, it is debates over provenance and
14 authenticity.  Fierce battles over attribution have been waged from time immemorial.

15      Despite favorable opinions from established experts such as museum curators,
16 gallerists, auction houses, and art historians, works by famed artists have later turned
17 out to be inauthentic, including:  Picasso, Vermeer, Rembrandt, Modigliani, Gaugin,
18 Monet, Chagall; and Giacometti.  https://www.insider.com/cases-of-faked-and-
19 forged-artwork-2019-1#a-portrait-of-william-shakespeare-turned-out-to-be-a-fake-10
20 Esteemed authorities frequently engage in intense disputes over the authenticity of
21 paintings by some of the world's most iconic artists, including *La Bella Principessa*
22 and *Salvador Mundi* attributed to da Vinci[28], *Christ and the Disciples at Emmau*
23 attributed to Vermeer, *An Allegory* attributed to Botticelli, and *Portrait of Alexander*

---

25 [28]*Salvador Mundi* recently sold for $450.3 million despite many da Vinci scholars disputing its
26 authenticity as a work created by da Vinci.  "While many critics later noted that the *Salvador Mundi* has interesting passages, including the soft modeling of Jesus' right hand and the finesse of his tight curls, they doubted that the work was entirely by Leonardo. The attribution continues to be
27 a subject of debate among scholars and critics. . . . The record-setting sale of an artwork with such serious defects is perhaps only one of the reasons that the *Salvator Mundi* is the latest artwork to be
28 called the 'most controversial.'"https://www.britannica.com/story/why-is-the-salvator-mundi-called-the-worlds-most-controversial-painting

*Mornauer* attributed to Hans Holbein, among so many others.

https://www.austinartistsmarket.com/famous-fakes-art-history/;

https://en.wikipedia.org/wiki/List_of_artworks_with_contested_provenance;

The estimable Metropolitan Museum of Art has admitted that a large number Rembrandts, once determined genuine by its renowned curators, are not authentic.

> "The Metropolitan Museum possesses one of the most significant groups of paintings, drawings, and etchings by the master, his pupils, and imitators—about eighteen paintings ascribed by common consent to Rembrandt, and about twenty-five that were once thought to be by him but are now recognized as works by pupils, followers, or, in a few cases, later imitators, as well as a large number of authentic drawings and etchings along with some problematic examples in these media. We have, therefore, limited the exhibition to the Museum's holdings. This has permitted us to focus more closely upon the works presented than would have been possible with loans from other museums."

https://www.metmuseum.org/art/metpublications/Rembrandt_Not_Rembrandt_in_The_Metropolitan_Museum_of_Art_Aspects_of_Connoisseurship_Volumes_I_and_II

My point here is a simple one: the fact that conflicting expert opinion exists over an artwork is not uncommon. In our case, given the collection of Basquiat experts who have weighed in with detailed, reasoned, and persuasive authenticity opinions, *it is impossible to make the case that the 25 paintings are obvious fakes, and the Barzman Fakes provenance is rendered utterly improbable*.

## THE NEED FOR AN EVIDENTIARY HEARING

Based on the foregoing summary of the evidence, I respectfully submit that an evidentiary hearing on the truthfulness of Barzman's claims is warranted. As the Court well knows, crime victims have the "right to be reasonably heard at any public proceeding in the district court, including . . . sentencing." 18 U.S.C. § 3771(a)(4). That right would be hollow if a crime victim could not present evidence to substantiate its statement where the issues are disputed.

In our case, the relief sought by BVCG is in the nature of restitution. This is not restitution in terms of repayment of the money spent to purchase our paintings because BVCG did not purchase forged Basquiat paintings. We got what we thought

1   we were buying—paintings from Mumford's storage locker attributable to Basquiat.

2   The restitution that we need and merit is restoration the paintings' legitimacy as

3   related to Barzman's perjury.

4     The process that we would suggest is the following:

5     1. At the sentencing hearing on August 18th, the Court would announce that

6       it is deferring sentencing pending the receipt of evidence at a future

7       hearing on the factual issues raised by BVCG's statement.

8     2. The Court would set a date for the evidentiary hearing.

9     3. The Court would establish a schedule for exchange of information in

10      advance of the evidentiary hearing, including witness lists and exhibits.

11    4. The Court would authorize BVCG to subpoena witnesses to testify at the

12      evidentiary hearing.

13    It is not our intention to gratuitously burden the Court with this added work in

14  a case that appeared to be sailing smoothly toward a negotiated resolution without a

15  trial.  As I hope that I have shown the Court, this is not a routine guilty plea.  What

16  Barzman is attempting to do here is to benefit himself at the grave detriment of

17  BVCG.  A brief delay in finalizing his case will not prejudice him, but it will afford

18  due process to his victim.  *Cf. Taylor v. Hayes*, 441 U.S. 488, 500 ("Due process

19  cannot be measured in minutes and hours or dollars and cents.")

20          **CONCLUSION**

21    When Congress mandated that federal crime victims be afforded the right to

22  inform sentencing judges of the impact of the defendant's conduct in physical,

23  emotional, and/or financial terms, that opportunity was supposed to be meaningful.

24  In this case, the Court has now been presented with seriously disputed facts about the

25  nature of Barzman's crime and the truthfulness of his account under oath.  This sharp

26  disagreement cannot be resolved without evidence.  As this Statement reveals, BVCG

27  has a great deal of evidence to share with the Court.

28    Thank you very much.

Dated:  August 10, 2023                    Respectfully submitted,

Pierce O'Donnell

Co-manager

Basquiat Venice